CASE 13—RESCISSION FOR FRAUDULENT MISREPRESENTA-
TION—MARCH 14.

# Livermore v. Middlesborough Town Lands Co.

APPEAL FROM BELL CIRCUIT COURT.

RESCISSION—FRAUD AS GROUNDS OF.—In order to establish fraud against
which equity will relieve, it must appear that the misrepresen-
tation was a material fact (as distinguished from opinion), at
the time or previously existing, and not a mere promise for the
future; such misrepresentation must be relied upon by the
person whose action is intended to be influenced, and must be
made with knowledge of its falsity, or under circumstances
which did not justify a belief of its truth. Tested by this rule
the defendant failed to make out a case of fraud entitling him
to a rescission of his contract of purchase.

G. W. SAULSBERRY FOR THE APPELLANT.

1. The facts developed by the testimony show actual fraud on the
part of the promoters of the Middlesborough Company in the
contract in which the notes sued on were executed.
2. If a statement of fact actually is not true, is made by a person who
honestly believes it to be true, but under such circumstances as
devolved upon him the duty of knowing its truth, such repre-
sentations are fraudulent in equity, as nothing overcomes a pre-
existing duty of knowing and telling the truth.

Citations: Peyton v. Butler, 3 Hayw., Tenn., 141; Barnard v. Rorer
Iron Co., 1 Pickle, 139; Smith v. Harrison, 2 Heiskill, 241; Lewis
v. McLemore, 10 Yerger, 238; Baldwin v. Franklin, 8 Lea, 67;
Bigelow on Frauds, 484; 50 American St. Rep., 285;
3 Yerger, 178; 50 Am. Dec., 130; 2 Pom. Eq. Jur., 879-880;
Cooley on Torts, 494, 501; 8 Am. & Eng. Ency. of Law, 642;
Bigelow, 497-535, 44, 5; Lawson R. R. & P., 2356, 2342; Bullett
v. Farran, 18 Am. St. R., 485; Haxter v. Bast, 11 Am. St. R.,
877; Winston v. Gwathmey, 8 B. M., 19; Babcock v. Case, 61
Pa. St., 427; Prewitt v. Trimble, 92 Ky., 176; 36 Am. St. R.,
586; Greenleaf on Ev., 1 vol., 441; Rohrschneider v. Knicker-

Livermore v. Middlesborough Town Lands Co.

bocker Ins. Co., 76 N. Y., 200-16; 2 Pom., 88; Carter v. McNutt, Trustee, 13 Ky. Law Rep., 922.

C. C. TURNER ON THE SAME SIDE.    (GEO. W. SAULSBERRY OF COUNSEL.)

1. In support of the second point made by Mr. Saulsberry, counsel cited: Tiedeman on Sales, p. 161, sec. 160; Prewitt v. Trimble, 92 Ky., 176; Bigelow on Fraud, vol. 1, p. 411, 414, 415; Pendaris v. Gray, 41 Tex., 326; Wilson v. Carpenter, 91 Va., 183; Carter v. McNutt, 13 Ky. Law Rep., 879; Bigelow on Fraud, p. 425; Tarkington v. Parvis, 128 Ind., 182.

2. In response to the point made in oral argument that appellant was estopped by his connection with the appellee company to plead the fraud which was practiced upon him by it, counsel urged that appellant had no sort of connection with any of said corporations at all after the sale of lots which was sought to be rescinded.

J. R. SAMPSON FOR THE APPELLEE.    (J. W. ALCORN, J. H. TINSLEY, CHAPMAN & SAMPSON, OF COUNSEL.

From the papers as shown in the record, there has been no fraud perpetrated by this company upon appellant in this transaction.    Pidcock v. Swift, 51 N. J. Eq. (6 Dickinson 405); Tinsley v. Ogg, 7 Dana, 385; 21 Am. & Eng. Ency. of Law, 84-90; 2 Pom. Eq., 881; 8 Am. & Eng. Ency. of Law. 653; notes; Musick v. Gatzmeyer, 47 Ill. App., 329; 8 Am. & Eng. Ency. of Law, 637; Southern Development. Co. v. Silva, 125 U S. Supt. Ct., 680; Pom. Eq., secs. 855, 856; Jasper v. Hamilton, 3 Dana, 284; Wakeman v. Dalley, 51 N. Y., 27; Marsh v. Falker, 40 N. Y., 566; Meyer v. Amidon, 45 N. Y., 169; Kuntz v. Kennedy, 79 N. Y. Sup. Ct., 314; Wade v. Ringo, 25 S. W. R., 907; Breemersch v. Linn, 59 N. W. R., 314; Lawson's Rights, Remedies and Practice, vol. 5, secs. 2344, 2345; Brandt Surety & Guaranty, sec. 404; First Natl. Bank of Stanford v. Mattingly, 14 Ky. Law Rep., 69; Sawyer v. Prickett, 86 U. S., 107; Ball v. Lively, 4 Dana, 370; Tanner v. Clark, Carter v. McNutt, 13 Ky. Law Rep., 922; Huls v. Black, 14 Ky. Law Rep., 805; Turner v. Cape Fear Co., 2 Devereux, 239; 61 Penn. St. R., 427; 10 Yerger, 238; 3 Yerger, 178; 3 Hayward 141; 1 Pickle, 141; 2 Heiskell, 243; 18 Am. St. R., 485; 11 Am. St. Rep., 877; Prewitt v. Trimble, 92    Ky.,    176;    Stewart    v.    Dougherty,    3    Dana,    481;

Buford v. Brown, 6 B. M., 553; Marksbury v. Taylor, 10 Bush, 520; Campbell v. Hillman, 15 B. M., 518; Phelps v. Quinn, 1 Bush, 378; English v. Thomasson, 82 Ky., 280; Nell v. Nell, 16 Ky. Law Rep., 195; Rufner v. Riley, 81 Ky., 166; Wood v. Wood, 78 Ky., 628; Fisher v. May, 2 Bibb., 450; Gore v. Peak 15 Ky. Law. Rep., 279; Brannin & Co. v. Loving, &c., 16 Ky. Law Rep., 331; Trimble v. Reid, 17 Ky. Law Rep., 494; Same v. Ward, 17 Ky. Law Rep., 509; Banque Franco, &c., v. Browne, 34 Fed. Rep., 190; Ewing v. White, 6 Fed. Rep., 451; Slaughter v. Gerson, 13 Wallace, 235; Company v. Newland, 39 Pac. Rep., 36.

CHAPMAN & SAMPSON IN A SUPPLEMENTAL BRIEF FOR THE APPELLEE.

1. Under the pleadings the judgment is correct and should be affirmed regardless of evidence. The plea of estoppel should be sustained.

2. The appellant can not be heard to ask a rescission because he has ratified the contract and because he has waited too long and because his counter-claim for rescission is not good in that it fails to show prompt intention to disavow the contract.

3. If all representations and promises which failed of performance were representations and promises and mere statements of hopes and expectations, and not made with purpose of deceiving, but in good faith, they can not be made the basis of an action or defense.

4. There is an entire failure of proof of fraud in the failure to prove knowledge that the statements were not true or intended to deceive.

Citations: Stwart v. Dougherty, 3 Dana, 481; Ball v. Lively, 4 Dana, 373; Buford v. Brown, 6 B. M., 553; Lightburn v. Cooper, 1 Dana, 275; Marksbury v. Taylor, 10 Bush, 520; Campbell v. Hillman, 15 B. M., 518; Phelps v. Quinn, 1 Bush, 378; English v. Thomasson, 82 Ky., 280; Prewitt v. Trimble, 13 Ky. Law Rep., 581; Neel v. Neel, 16 Ky. Law Rep., 195; Ruffner v. Ridley, 81 Ky., 166; Wood v. Wood, 78 Ky., 628; Fisher v. May, 2 Bibb., 450; Waters v. Mattingly, 1 Bibb., 245; Jasper v. Hamilton, 3 Dana, 280; Peak v. Gore, 15 Ky. Law Rep., 279; Brannin & Co. v. Loving, &c., 6 Ky. Law Rep., 331; Trimble v. Reid, 17 Ky. Law Rep., 494; Same v. Ward, 17 Ky. Law Rep., 509; Banque Franco Egyptienne v. Brown, 34 Fed. Rep., 190;

Ewing v. White, 69 Fed. Rep., 451; Slaughter v. Gerson, 13 Wall., 235; Company v. Newland, 39 Pac. Rep., 36.

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT.

The appellee, the Middlesborough Town Lands Company, a Kentucky corporation, brought suit against appellant, averring that on the 17th day of October, 1889, the Middlesborough Town Company sold Livermore five lots in the city of Middlesborough, for the deferred payments upon each of which Livermore executed three notes, due one, two and three years after date. The note due one year after date had been paid, and judgment was prayed for the amount of the notes due at two and three years, and for the enforcement of the vendor's lien retained in the deed, those notes having been, for value, assigned to appellee. To this petition Livermore filed an answer and counter-claim, alleging that the town company was formed for the purpose of engaging in speculation and "booming" Yellow Creek Valley, under the name of the city of Middlesborough; that it acquired about 5,000 acres of land in the vicinity of Yellow Creek Valley solely for the purpose of speculation; that it was unimproved and miles from any other town, and that, upon acquiring it, the company laid off a large part of it in blocks, town lots, streets, alleys and parks; that the territory laid out had sufficient area to erect a large city; that the company had charts and maps printed, showing spaces set apart for various large manufacturing establishments, iron furnaces, spoke factories, etc., and laid off dummy lines and street railways, and did various other things to induce the belief by the public that a large and prosperous city would soon be built; that thereupon the company fraudulently gave out to the public that it could and would *fulfill its promise*, commenced the construction of a street-

car line, long since abandoned, and which it has wholly
failed to construct or operate; that it has partly construct-
ed a dummy line; that only a few of the industries marked
off on the charts have ever existed, except in imag-
ination; that there has been partly constructed by others
than the company, but never operated, one furnace and
one steel plant; that it staked off and showed the public
where it intended to build or procure the building of a
large charcoal furnace, and procured the foundation to
be laid, all of which was done for the fraudulent purpose
of deceiving the public; that such maps were circulated
in large numbers in this and other countries; and that
the company, by its officers and agents, represented to
the public, of which defendant was a part, and to defend-
ant, and by printed prospectuses spread broadcast to the
public, that many vast enterprises had been established,
and secured to be established, in the city of Middlesbor-
ough, to-wit, the Middlesborough Building & Investment
Company, with a capital of $100,000, and fifteen other
named enterprises, the capital of each being stated in the
petition; that defendant was lured to the town of Middles-
borough, and to purchase the property for which the notes
sued on were given, by those advertisements and represen-
tations, and then induced to buy the property set up in the
plaintiff's petition;" that he had now ascertained, and the
information was then known by the company, that no such
institutions as ten of the institutions theretofore named in
the answer, with any capital, had been procured to locate
at Middlesborough; that three of the named institutions
had a much less capital stock than had been represented,
and that the representations in regard to each of said insti-
tutions were made with intent to defraud and deceive the
public and the defendant; that one of the named institu-

tions, the Cumberland Gap Charcoal Furnace, was commenced to be constructed for the fraudulent purpose of deceiving and luring the public into the belief that the company would comply with its representations, but that, soon after the defendant and others bought property, the work thereon ceased, and nothing further has been done towards its completion; that, prior to his purchase, the company, by its authorized agents, represented that the iron and steel works would be immediately constructed and pushed to completion as rapidly as could be done, and would give employment to about 7,000 men, but that none of such iron and steel works have been constructed or operated; that the company represented that the industries already secured to be located in Middlesborough would employ at least 12,000 men, and he relied upon these representations and statements, which were fraudulent; that none of the enterprises had been established, and that, by reason of such failure, the property is almost worthless, and not worth more than one-fifth of the amount sued for; that if the representations had been true, Middlesborough would now be a city of 40,000 or 50,000 inhabitants, and the property purchased worth much more than was agreed to be paid; that the appellee is the successor of the town company, being the same company re-organized in a different name; and that it took the notes with knowledge of, and subject to, all existing defenses. He prayed that the notes should be canceled.

In a second paragraph, reiterating the averments of the first paragraph, and averring that the matters and things set out in the first paragraph were to have been done in a reasonable time, which had expired, he prayed that the deeds to him be set aside, and that he recover $1,237.50, with interest, averring that he was an unmarried

[10]

man, was such at the date of the execution of the deeds, and ever since, and that "he here tenders back to plaintiff any title or right to said lots he may have received by said deeds executed to him." He further averred that by reason of the failure of the town company to perform its agreements, and by reason of the false and fraudulent representations, he had been damaged in the sum of $1,237.50, with interest, and prayed judgment therefor.

In the reply, all the affirmative averments of the answer were denied as to the representations and the failure to fulfill them; and it was pleaded affirmatively that a number of the enterprises mentioned had been established. The company further pleaded that it, in good faith, undertook to build up the city and to establish many large industries there, and did establish and cause to be established many such industries; that it attempted to establish many which had failed, and many which were established had, by reason of failure in business, ceased to exist; that, in doing this, it had expended great sums of money in good faith, to build up the city, and for no other purpose, and that the failure of any enterprise was without any fault on its part, or that of its predecessor; that if any of the representations set forth as having been made by it were actually made, which it denied, or any of them were false or fraudulent, the defendant, for a long time prior to the filing of this suit and of his answer, had full knowledge of all the facts in regard thereto, and knew whether they were false or not, and, with full knowledge of the truth, made payments on the purchase; and this knowledge and laches upon appellant's part was pleaded as an estoppel of his right to claim anything by reason of the alleged representations.

No rejoinder was filed to its reply.

Appellee, before filing its reply, demurred to the answer and counterclaim, and also moved the court to re quire appellant to elect which cause of action he would prosecute by his counter-claim, whether for the recission of contract or for damages. The court overruled both demurrer and motion.

Upon final hearing, the court dismissed appellant's counter-claim, and gave judgment for appellee for the amount of its notes and for the enforcement of its lien.

In the view we have taken of this case, it is unnecessary to consider the demurrer or the plea of estoppel.

As was to be expected, the evidence is conflicting, and much irrelevant testimony has been introduced. The contract was made in October, 1889, and the evidence taken between four and five years thereafter. Testimony taken after such lapse of time is, in the nature of things, uncertain and unreliable; and especially is this true of testimony taken as to conversations and oral statements. General statements of belief, and of want of what is expected, under the influence of interest and desire, become distorted in the memory, and assume the proportions of definite statements of fact, or of solemn obligations to perform. On the other hand, such statements fade from the recollection of the persons making them, till not a trace remains. We can attach no very great degree of importance to such testimony, especially when, as in this case, the plaintiff claims to have relied on each and all of more than sixty-six representations which he avers were made, and were the inducements which led him to make his purchase, and but for which he claims he would not have made the investment.

A great nmuber of circulars, prospectuses, newspapers and maps were filed with the depositions. All except

three of them were issued subsequently to the date of the purchase, and, if admissible, at all, are certainly not admissible as showing representations which induced appellant to buy.

A careful examination of the conflicting testimony has led us to the conclusion that the weight of the testimony as to the oral statements is in favor of the theory that those statements were statements of what was hoped for and expected, and that some of the conversations which are claimed to have taken place with officers of the company were mere casual statements of what the company was going to do, made, not as agreements, but as statements of the expectation of the company. And taking Exhibit A—which is probably the strongest documentary testimony relied on by appellant—which is a prospectus purporting to be issued, not for the Middlesborough Town Company, the predecessor of appellee, but on behalf of the American Association, Limited, and various enterprises which had been inaugurated by it at Cumberland Gap and in the vicinity, including the railroads which had reached that locality, we find nothing on page fifteen, where the sixty-six enterprises whose failure is complained of in the answer are set forth, which can be construed as a statement that any of them were established, or to be established, in the town of Middlesborough.

Upon the other hand, if ever good faith was shown in the organization and management of what is called a "boom town," it has been shown in this case. It appears that the American Association, Limited, an English company, acquired about one hundred thousand acres of land at Cumberland Gap, and in the vicinity, which included a portion of the Yellow Creek Valley. The intention and object was to build up a great iron-producing industry in that

region, the promoters of the project believing, from exam-
inations which had been made by expert geologists, that
an unlimited supply of fine coking coal and superior iron
ore was accessible in the immediate vicinity.   Other valua-
ble minerals were supposed to be obtainable in that re-
gion, and it was expected to develop their production; but
the central idea of the project was the iron industry.
The association induced the Louisville & Nashville Rail-
road Company to build a line to Middlesborough, and its
promoters organized the Knoxville, Cumberland Gap &
Louisville Railroad Company, tunneled Cumberland Gap,
and built a railroad to Knoxville, besides securing a connec-
tion with the Norfolk & Western.   The Middlesborough
Town Company was then organized for the purpose of build-
ing a city in the Yellow Creek Valley, and purchased from
the American Association and other parties over five thous-
and acres of land in that valley, which was laid out in lots
and streets, and maps thereof published.

The town company organized other companies for street
and freight railroads, an electric light company, a water
company, a hotel company, and various others.   Millions of
dollars furnished by the stockholders of the town com-
pany and of the companies organized and promoted by it
were expended.   The primary cause of the enterprise was
the supposed existence of vast deposits of coal and iron
ore in the vicinity, and the controlling motive the establish-
ment of a great iron and steel center.

Before the sales of October, 1889, appellant visited the
place, made inquiries, and undertook to investigate the
chances of profitable investment.   In October a public sale
of lots in the town was had.   At that time a few of the
companies organized and promoted by the town company
were at work; the dummy line and the electric light com-

pany were in operation; and furrows had been run and signs put up to indicate where some of the principal streets were to be. There was no town—nor anything in the semblance of a town. It was a typical "boom town." As a matter of course, speculators who purchased lots made reckless statements, in order to sell them at an advanced price. But the result was that by reason of the influx of speculators, and of men who intended in good faith to engage in the various enterprises expected to be established, an actual town was created.

In 1891 occurred the failure of Baring Brothers. There was an unprecedented constriction of the money market in England, and the Bank of England was compelled to ask assistance from the Bank of France. Notwithstanding the financial collapse in England, the English shareholders of the company agreed to take stock in a new company, put into it $600,000, took over the property of the old company, and assumed its liabilities. The new company continued the work of building a city in the Yellow Creek valley—so far as we are able to ascertain from this record—with the utmost good faith. The "boom," however, had collapsed. Purchasers of lots were unable or refused to pay their notes, and, some two years after the failure of the Barings, the panic of 1893 occurred in this country. The shareholders thereupon organized a third company,—the appellee in this case,—took in the stock of the second company, and paid into the new company $350,000 more to pay off the indebtedness of the former companies.

The enterprise is still being prosecuted. The record discloses the fact that at the date of the submission of this case, preparations had been made and plants established for several large industries, which were

at that time waiting for a favorable season to commence business. As a matter of course, the projectors of many of the enterprises expected to be instituted were frightened away by the panic, and many others failed by reason of it. The appellant was in the town during the sales of October, 1889, and for a considerable time thereafter was a director and promoter in a number of the enterprises of whose failure he complains in this suit, notably the cemetery company; bought other lots and sold them; obtained, by reason of his connection with the company, inside information, and made money upon all the lots which he sold. It is not necessary here to consider the question whether *all* the lots which he purchased from the town company were but items of one transaction, and whether, if he made a profit upon the whole transaction, he can be heard to complain that he lost upon any of the individual items.

But appellant complains that the company has not accomplished everything which its officers stated was expected to be accomplished, and that third persons have not made the improvements and established the industries which the officers of the company represented they would establish. Without stopping to consider how far appellant is concluded by the actual investigation which he himself made, and the opportunities for such investigation which the record shows he enjoyed to an unusual degree, we shall proceed to consider the legal questions raised upon the main issue. What, under the law of this State, is a fraudulent representation which will entitle a party to a rescission of a contract?

Appellant claims that matters of opinion may amount to an affirmation of fact, and be an inducement to a contracting party, especially where the parties

are not on equal terms, and one of them is presumed to have means of information not equally open to the other, and that representations as to matters to be performed in the future, whether by the party making the representations or by third persons, may form the basis of a suit for rescission. He further contends for the distinction between the rule at law and in equity laid down in Cooley on Torts (page 497), where it is said: "It is often said that, in order to render false representations fraudulent in law, it must be made to appear that the party making them at the time knew they were untrue. But this rule has so many exceptions that it is difficult to affirm with any confidence that it is a general rule at all. It is certain that courts of equity do not limit their action to it in giving relief, when representations prove it to be untrue in fact.

And in Bigelow on Frauds (volume 1, p. 410), the rule at law is thus stated: "One who brings about a sale or a contract by misrepresentation commits no fraud, if his representation was, when made, innocent in the ordinary sense of being free from moral wrong; i. e., if it was honestly believed to be true under circumstances permitting honest belief. Hence no action for damages can be brought, however grievously the party dealt with may have suffered."

And on page 412 the rule in equity is thus stated: "The 'fraud' upon which a proceeding to effect rescission is based is found in the purpose, or it may be the actual attempt, to enforce the contract after knowledge of the falsity of the party's representations has been brought home to him. Knowledge, at the time the representations were made, that they were false, only makes a stronger case. It is not essential. We speak of the rule as a rule

of equity. In courts of common law the rule stated has not prevailed."

Again, on page 413, Mr. Bigelow refers to the case of Kennedy v. Panama Mail Co., Law Rep., 2 Q. B., 580, in which Lord Blackburn stated the distinction with great clearness. Illustrating the rule at law, Lord Blackburn said: "For example, where a horse is bought under belief that it is sound, if the purchaser was induced to buy by a fraudulent representation as to the horse's soundness, the contract may be rescinded. If it was induced by an honest misrepresentation as to its soundness, though it may be clear that both vendor and purchaser thought they were dealing about a sound horse, and were in error, yet the purchaser must pay the whole price, unless there was a warranty."

This distinction is also recognized by Story and Pomeroy, and is undoubtedly a well-recognized distinction in England, and in the greater number of the States of this Nation. But it has not been recognized in this State, except in a case which was overruled. Moreover, this court has not gone to the full extent of the rule as laid down in Pomeroy and Bigelow, but has held, in substance, that a party must, by the contract, protect himself against the falsity of the representations made to him, except when such representations were actually fraudulent; that is, false, and known to be false, by the party making them, or made under circumstances which did not permit honest belief in their truth.

In the case of Waters vs. Mattingly, 1 Bibb, 244, [4 Am. Dec., 631], a suit in equity for the rescission of a contract for the sale of a horse, it was held immaterial whether the party making the representation of soundness

knew it to be false or not. If it was in fact false, equity would relieve.

But in Lightburn v. Cooper, 1 Dana, 273, the court, through Chief Justice Robertson, said: "If the seller knew that the clock was not a good timepiece, his false representation was fraudulent, and then the tender of the clock would have operated as a rescission of the contract; but without such knowledge, actual or presumed, the simple fact that his representation was untrue would not affect the legal obligation of the contract."

In Jasper v. Hamilton, 3 Dana, 283, a suit for the rescission of a contract of sale of land, the court, through Judge Ewing, said: "In none of the bills is it alleged specifically that the defendant knew of the confliction with Welch's claim, and fraudulently concealed it from the complainant. . . To constitute fraud, the vendor must *know* the fact which he represents to be different from his representation; or, knowing the fact to exist, fraudulently conceals it from the vendee."

There was, however, another question in that case, upon which also the court based its decision, viz., that the contract was a chancing bargain.

In the case of Stewart v. Dougherty, 3 Dana, 479, "Dougherty, apprehending that he had been defrauded by Stewart in a 'horse swap,' tendered to him the horse he had gotten from him, and thereupon sued him for the conversion of that which had been given in exchange." Chief Justice Robertson, delivering the opinion of the court, said: "The old case of Waters v. Mattingly which seems to have been relied on by the circuit judge as conclusive authority, is inconsistent with the well-established doctrine of the law, and has been repeatedly disregarded and overruled by this court.

"The true doctrine is that an innocent misrepresentation, not being fraudulent, furnishes no cause of action, nor any sufficient ground for rescinding a contract. Unless the party who makes the representation knows when he makes it that it is false, he is not deemed guilty of fraud, however erroneous or untrue it may happen to be."

In Ball v. Lively, 4 Dana, 370, a common law action, the court, through Judge Ewing, said: "Fraud consists in a willful misrepresentation of facts, or in a fraudulent concealment of them with a view to deceive. If a party honestly believe the representations which he makes to be true, he is guilty of no moral turpitude or legal responsibility for making them. . . . To be guarded against injury, each of the contracting parties should inform himself of the true state of the facts, or exact a warranty from the other for his indemnity, knowing, as he should be taught by the law, that he has no redress over or discharge from his contract, unless he has been deceived into it by the willful misrepresentations or fraudulent concealment of material facts by the other contracting party."

In Buford v. Brown, 6 B. Mon., 553, a bill in equity for the relief against judgments upon notes given for blooded fillies, in the sale of which vendees claimed to have been defrauded by misrepresentation in regard to the pedigree of the fillies, the court, after discussing the alleged misrepresentation, said: "The material point in determining the question of fraud is the known falsity of the affirmation when made," and denied the relief sought.

In Campbell v. Hillman, 15 B. Mon., 517, [61 Am. Dec., 195], action at law for fraud, the court, through Judge Simpson, said: "To constitute fraud, however, it is not only necessary that the representation should be untrue,

but also that the party making it should know it to be so at the time it was made."

In Phelps v. Quinn, 1 Bush, 376, a suit for rescission of a contract of sale of mules which were visibly lame, the doctrine stated in the former cases is recognized, but is modified as follows, Judge Hardin delivering the opinion: "But while this general principle need not be controverted, it does not extend so far as to protect a party from the consequence of his false representations in regard to visible defects in property, when, assuming to know the nature and extent of such defects, he deceives or misleads another by a false explanation, however ignorant he may be of the real condition of the property."

Robertson v. Clarkson, 9 B. Mon., 506, is referred to in support of this case, but is not altogether in point, as the representations in that case were absolutely false, and so known to be by the vendor.

Wood v. Wood, 78 Ky., 629, and Ruffner v. Ridley, 81 Ky., 166, were suits for damages for fraudulent concealment, and therefore bear little application to the case at bar. In the former of these cases, both of which were decided by Judge Hines, the court said: "It is not the truth or falsity of the representation that constitutes the fraud. It is the concealed motive in the breast of appellant, and which prompted him to make the representation."

English v. Thomasson, 82 Ky., 280, was a suit upon lien notes, to which a counter-claim was pleaded, praying a rescission of the contract of purchase on the ground of fraudulent misrepresentations as to title. Having assumed that the title was defective, Judge Holt, delivering the opinion of the court, said: "Admitting for argument's sake that it was so, yet the defendant is not entitled to

Livermore v. Middlesborough Town Lands Co.

the relief asked by him upon the mere ground that this
was so, and that the appellee represented differently.  It
is insisted by the counsel for the appellant that this is
an unsettled question in this State, and that the general
rule elsewhere is that the falsity of the representation is
sufficient, though innocently made.  A careful review,
however, of the authorities has satisfied us that in this
State the question is not an open or doubtful one."

The court cited the case of Buford's Adm'r v. Guthrie, 14
Bush, 690, in which it was said by Judge Cofer, delivering
the opinion of the court:   "Where contracts have been
fully executed, there can be no rescission, unless there has
been actual fraud; and an innocent misrepresentation as
to the state of the title is not such fraud as will warrant a
rescission."

After quoting from Justice Story (1 Story, Eq. Jur., sec-
tion 193), as follows:  "Whether the party thus repre-
senting a material fact knew it to be false, or made the
assertion without knowing whether it be true or false,
is wholly immaterial," .   .   . Judge Holt said: "The distin-
guished author doubtless did not intend to, nor does his
statement, in our opinion, apply to a case of innocent mis-
representation by a party as to the state of his title where
the vendor is not insolvent or a non-resident, and the
vendee is in quiet possession, and has chosen to provide
for his protection by a warranty of the title; and, in the
light of the numerous decisions cited, we could not so
hold, even if supported by such eminent authority."

In Peak v. Gore, 94 Ky., 534, [23 S. W., 356], appellee,
by false representations that a hotel was worth $10,000,
that he had been offered that sum for it, and that its earn-
ing capacity was from $25 to $50 per day, induced appel-
lants, who were persons without practical knowledge or

experience of the value or management of hotel prop-
erty, to purchase it for that sum, when, in point of fact,
it was hardly worth $5,000.  Suit was brought for rescis-
sion of the contract, and this court, through Judge Lewis,
said, after reciting the facts:  "But as they purchased
after having time and opportunity to ascertain for them-
selves, value of the property, and did in fact examine it,
commendation or even false representation of its value
by Gore can not, according to settled rule, afford ground
for rescission."

In Neel v. Neel, 16 Ky. Law Rep., 195 [26 S. W., 805], Judge
Hazelrigg thus stated the distinction between the rules ap-
plicable to specific performance, and to rescission of exe-
cuted contracts:  "The ground upon which courts of equity
proceed in rescinding or canceling executed contracts 'is
more narrow, and to be more carefully trodden, than that
upon which they refuse specific performance, or even de-
cree executory contracts to cancellation.  Nothing but
fraud or palpable mistake is ground for rescinding an
executed contract, (Graham v. Pancoast, 30 Pa. St., 89;
Nace v. Boyer, Id., 109.")

That the same rule of evidence prevails in equity as at
law is emphatically stated in the case of Marksbury, &c., v.
Taylor, &c., 10 Bush, 523.  Section 190 of Story's Equity Ju-
risprudence had been quoted, discussing the remark of Lord
Hardwicke that, in equity, "fraud may be presumed from
the circumstances and condition of the parties contract-
ing; and this goes further than the rule of law, which is,
that fraud must be proved, not presumed."  Said Judge
Cofer, delivering the opinion:  "We can not subscribe to
the doctrine attempted to be deduced from the fore-
going quotation, to the effect that the chancellor may
find fraud as a fact on less evidence or on evidence differ-

ent from what would be required to authorize a jury to find the same fact. That which will satisfy the mind of one may not satisfy the mind of another; but the true rule in all courts, without regard to their character, must be to require such legal evidence as will overcome, in the mind of the tribunal, the legal presumption of innocence, and beget a belief of the truth of the allegation of fraud. Any other rule would be calculated to create invidious distinctions between the different courts of the country, and would make the rights of parties depending upon questions of fraud or no fraud to turn upon the accident which brought them into the particular forum, and not upon uniform and known rules of law. . . . The chancellor, like a jury, must have such evidence as satisfies the mind to a reasonable degree that fraud has been committed before he is justified in finding its existence."

In Prewitt v. Trimble, 92 Ky., 177, [36 Am. St. Rep., 586; 17 S. W., 356], appellee (president of a bank) and the board of directors caused to be published a statement of the resources and liabilities of the bank, signed by the cashier. The president sold stock in the bank on the strength of that statement, the meaning of which was explained by him at the time of the contract, which statement proved in a short time to be a gross misrepresentation of the condition of the bank. It was held that "the cashier's statement was published and circulated by authority of the president and directors for the purpose and in expectation of its being accepted and treated by the public as in all respects true and reliable, thereby not only increasing business of the bank, but keeping up or enhancing market value of the stock, in which of them had a personal interest." Said the court, through Judge Lewis:

"Representations by a party having means of knowledge in regard to a matter not possessed generally are apt to be believed and acted upon, especially if he is in a situation where he owes a duty to the public to deal honestly and intelligently. Therefore, something more than use of ordinary diligence to know the condition of a bank should be required of the president in order to exempt him from liability to a person who has suffered loss by a false statement or report of its affairs officially made or affirmed by him, especially when he has been thereby personally benefited."

In this case the doctrine of responsibility for false representation was carried further than it had ever been carried in this State, for in the argument of the opinion it was stated that relief might be had in damages, or by equitable proceedings, for a false representation, when made: "First, without actual knowledge of either its truth or falsity, as when the party has affirmed his knowledge by a positive statement which implies knowledge; second, when made under circumstances in which the party ought to have known, if he did not know, of its falsity; as when, having 'special means of knowledge,' it is his duty to know."

A rescission of the contract of sale of the bank stock was granted, the court citing with approval section 145 of Cook on Stock and Stockholders as to statements by authorized agents of a corporation in regard to the status of the corporation, whereby subscriptions are obtained, but calling special attention to the rule there laid down that "in all these cases a distinction between statements relative to the prospects and capabilities of the enterprise, and statements specially specifying what does or does not exist, must be carefully borne in mind."

In First National Bank of Stanford v. Mattingly, 92 Ky., 657, [18 S. W., 940], the opinion in which was also delivered by Judge Lewis, a distinction between the position of a purchaser and that of a surety of a purchaser was stated. Said the court: "The well-settled rule is, as argued, that mere commendation, or even false representation, by the seller of property as to its value, when the purchaser has an opportunity to ascertain for himself such value by ordinary vigilance or inquiry, has no effect on the legal rights of the contracting parties, even when made with intention to deceive. Marshall v. Peck, Dana, 609. But that rule does not apply to conduct of a seller to the surety of the purchaser," etc.

In Clark v. Tanner, 100 Ky., 278, [38 S. W., 11], the case was decided on the ground that the notes sued on had been placed on the footing of inland bills of exchange, transferred before maturity without notice of the alleged fraud, and therefore held by the purchaser unaffected by the fraud of the original payee, even if of such character as to have avoided the contract between the original parties. But, in discussing the plea of fraud, the court, through Judge Lewis, stated the following dictum: "While it is not difficult to conceive a case where the vendor may make false representations of his intention and purpose, or intention and purpose of persons associated with him amounting to an implied undertaking to make, or cause made, improvements of such a character and extent as to greatly increase market value of real property in a mushroom town, and thus fraudulently induce a stranger to purchase property he has to sell, at extravagant or boom price, the purchaser himself is not wholly relieved of the duty of exercising reasonable diligence; for what is merely commendation of quality or value, present

[11]

or prospective, of his property that any vendor may legally make, should not be mistaken for false representations by the seller in respect to what is latent and not discernible by proper diligence of the purchaser."

The dictum expressed in the first sentence of the quotation, *supra*, if followed by the court, would be a clear departure from the doctrine laid down in numerous adjudicated cases in this Commonwealth, and from the doctrine specially insisted upon in the opinion by the same learned judge in Prewitt v. Trimble, *supra*.

The doctrine to be deduced from the Kentucky cases has been admirably stated by Judge Taft in White v. Ewing, 16 C. C. A., 296, 69 Fed., 451: "There remains now to be considered only the question raised upon the merits. Many of the defendants filed answers, and made defense. The only defense really pleaded in the answers was that the purchase of the lots and the execution of the notes had been induced by false representations made on behalf of the company. The evidence introduced to make this defense was very unsatisfactory, and entirely inadequate to sustain it. The prospectus of the company was wholly promissory, and did not state falsely any existing fact. Other statements contained in the daily press in regard to the company, its condition, capital and prospects are not traced to the agents of the company. Slight as the evidence is, it shows clearly enough that no one made any money out of the enterprise, but that the projectors, as well as the lot-owners, were all disappointed in their expectations. It was an enterprise made possible by the speculative fever so widespread at the time. Its disastrous failure was quite like that of a hundred others of like character, and is not evidence *per se* of a conspiracy to defraud on the part of the promoters, but only

of a buoyant self-deception in respect to the material possibilities, and an unreasonable blindness to material difficulties. All who took part in the scheme knew its speculative character, and can not escape liability on the obligations they assumed, unless they can put their fingers on false statements of material and existing facts which induced them to make the venture. This they have utterly failed to do."

To establish actionable fraud, or fraud against which equity will relieve—and, as we have seen, the same rule applies in Kentucky to both classes of cases—it must appear that the misrepresentation was of a matter of material fact (as distinguished from opinion), at the time of previously existing (and not a mere promise for the future); must be relied upon by the person whose action is intended to be influenced; and must be made with knowledge of its falsity, or under circumstances which did not justify a belief in its truth. This is the doctrine deducible from the Kentucky decisions. There are some modifications of this doctrine, but they are chiefly by way of substitution of an equivalent for some one of the essentials necessary to constitute fraudulent misrepresentation; as in the cases where it is held that a fraudulent concealment of a material matter of fact is the equivalent of an actual misrepresentation, and the cases in which a statement made as of personal knowledge, but without knowledge, was held to be equivalent to a statement whose falsity was known.

When tested by the Kentucky decisions, a case of fraud for which equity will relieve has not been made out. The enterprise, if disastrous to the purchasers of lots, was even more so, as shown by this record, to the projectors. In the nature of things, all who purchased at the sale in

October, 1889, were bound to know that the enterprise was speculative in its character. No sane man could look over that barren valley without knowing that the success of the projected city was dependent upon the countless vicissitudes of the future, and that he took long chances in buying lots in that as yet imaginary town. Men capable of consecutive thought must have known that in such a town prices per front foot which would have been high for property in the metropolis of the State, could not long endure; and, therefore, the conclusion is almost irresistible that such purchases were made in the hope of quick and large profits.

If that be the case here—and there is some evidence in appellant's letters to sustain that theory—if he miscalculated the strength and enduring vigor of the "boom" at Middlesborough, and made his purchases hoping for gain, and taking his chance of loss, then this case would come within the rule laid down in 2 Pom. Eq. Jur., section 815, as to chancing bargains. But it is not necessary to consider that view of the question. It is sufficient to say that a case of fraudulent misrepresentation has not been made out, under the law as administered in Kentucky. For the reasons given, the judgment is affirmed.

The whole court sitting, Hazelrigg, C. J., and Guffy, J., dissenting.

Burnam, J., concurs in the conclusion reached, but dissents from the argument.